IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 20, 2016 Session

## STATE OF TENNESSEE v. CUBEN T. LAGRONE

**Appeal from the Criminal Court for Knox County**
**No. 100994     Bob R. McGee, Judge**

_____

### No. E2014-02402-CCA-R3-CD-FILED-SEPTEMBER 30, 2016

_____

A Knox County jury convicted the Defendant, Cuben T. Lagrone, of attempted second degree murder, employing a firearm during the commission of attempted second degree murder, attempted first degree premeditated murder, employing a firearm during the commission of attempted first degree premeditated murder, and reckless endangerment. The trial court sentenced the Defendant as a Range II multiple offender to a total effective sentence of sixty-five years.   On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to suppress evidence from a cell phone seized during a traffic stop and weapons seized during a traffic accident investigation; (2) the trial court erred when it allowed the State to play a video recording during its opening statement; (3) the trial court erred when it instructed two witnesses, without first appointing counsel, to testify against the Defendant after the witnesses invoked their Fifth Amendment right to remain silent, and when it allowed the State to make an inappropriate comment in front of the jury on this matter; (4) the trial court improperly admitted into evidence the first victim's 911 call, images of the Defendant near or displaying firearms, and the Defendant's jail call, and improperly declined to admit into evidence the second victim's letter to the first victim; (5) the evidence is insufficient to sustain any of his convictions; (6) the trial court erred when it failed to grant a new trial based on a witness's recantation; (7) the trial court erred when it instructed the jury regarding the truthfulness of witnesses and regarding criminal responsibility; (8) the trial court erred when it denied the Defendant's motion for judgment of acquittal; (9) the trial court erred when it sentenced the Defendant; and (10) due process requires a reversal of the Defendant's convictions because of the effect of cumulative error.   After a thorough review of the record and relevant authorities, we affirm the trial courts judgments of convictions in all respects.   We vacate the sentences for the two counts of employing a firearm during the commission of a felony and remand for resentencing on those two counts.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

**in part, Vacated in part, and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Robert L. Jolley, Jr. and Megan A. Swain, Knoxville, Tennessee for the appellant, Cuben T. Lagrone.

Herbert H. Slatery III, Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Charme P. Allen, District Attorney General; Ta Kisha M. Fitzgerald and Philip H. Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I.   Facts

This case arises from a shooting that occurred on August 10, 2012, at the home of Oracle West and LaJuan Harbison.   A Knox County grand jury indicted the Defendant for the attempted first degree premeditated murder of Ms. West, the attempted first degree premeditated murder of Mr. Harbison, employing a firearm during the commission of a dangerous felony as to both counts of attempted first degree premeditated murder, and reckless endangerment.

### A.   Suppression Hearing

### 1. Cell Phone Seized During September 10, 2012 Traffic Stop

Prior to trial, the Defendant filed a motion to suppress all evidence resulting from the seizure of his cell phone during the September 10, 2012 stop of a vehicle driven by the Defendant.   At the suppression hearing, the parties presented the following evidence: Investigator Shelley Clemons, a Knoxville Police Department ("KPD") officer, testified that she was assigned to the family crimes unit and began investigating the Defendant on September 5, 2012, based on a Department of Children's Services ("DCS") complaint that the Defendant had left a child unattended in an apartment complex.   According to the information provided to Investigator Clemons, when the child was found, he told officers that he was in the Defendant's care.   Investigator Clemons began searching for information on the Defendant and learned through her investigation that there was another pending DCS investigation of the Defendant involving the same child.   Further investigation revealed that the Defendant had an outstanding warrant for driving on a suspended license.

On September 10, 2012, Investigator Clemons received a phone call from a former

2

KPD officer regarding Dontria Blair,[1] the mother of the child involved in the DCS investigation. The former officer was concerned about Ms. Blair's safety and believed that the Defendant had previously assaulted Ms. Blair. Investigator Clemons called one of Ms. Blair's family members, who reported that Ms. Blair was "en route" to the hospital to have surgery due to an injury and that the Defendant was driving Ms. Blair to the hospital. Ms. Blair's family member told Investigator Clemons that the Defendant and Ms. Blair were in Ms. Blair's vehicle, a red Buick Lacrosse, and that the child accompanied them. Anticipating their arrival at the hospital, Investigator Clemons asked other officers in the family crimes unit to assist her by making contact with the Defendant at the hospital and provided them with a description of the vehicle. Investigator Clemons then listened to the officers' radio transmissions and learned that the officers had made contact with the Defendant and taken him into custody. Investigator Clemons then traveled to the hospital to check on Ms. Blair's welfare and safety.

Investigator Clemons testified that she arrived at the scene where officers had stopped the vehicle; Ms. Blair had already gone inside the hospital to be admitted, and the child was with other family members. Investigator Clemons photographed the vehicle as she found it, including a cell phone located in the driver's seat. Investigator Clemons stated that she confiscated the cell phone, as well as the Defendant's driver's license and the cell phone charger cord. Investigator Clemons testified that she confiscated the cell phone in part because the DCS investigation indicated that Ms. Blair reported to police that the Defendant "texted and called her at work advising her that he had to leave [her child] alone at home because [the Defendant] was fleeing police."

After photographing the vehicle and the area around it, Investigator Clemons spoke to the child and then to Ms. Blair in the hospital's waiting area. Investigator Clemons "interviewed [Ms. Blair] in reference to the DCS investigation and the reason why she [was] at the hospital with a broken jaw." Investigator Clemons also took photographs of Ms. Blair. Ms. Blair gave Investigator Clemons information "pertaining to how she was assaulted" and "on what she was told by [the Defendant] on why the child was left alone." Ms. Blair also said she did not want to assist in the Defendant's prosecution.

Investigator Clemons stated that she then contacted Investigator Brandon Wardlaw, an officer with the violent crimes unit, who had transported the Defendant from the scene of the Defendant's arrest and who was also working the investigation of the August 10 shooting. Investigator Wardlaw advised her to confiscate the Defendant's cell phone and advised her that the Defendant had given Investigator

---

[1]Ms. Blair is identified at trial as "Dimetra Blair." For the purposes of consistency, we will refer to her as Ms. Blair throughout the opinion.

3

Wardlaw "permission to look at his phone." Investigator Clemons took possession of the Defendant's cell phone and "held on to it for Investigator Wardlaw." She then testified, however, that she "placed [the cell phone] on hold for [Investigator] Amy Jinks . . . who also had an interest in [the Defendant]" and who planned to file a search warrant for the cell phone. She stated that Investigator Jinks also worked in the violent crimes unit with Investigator Wardlaw.

Investigator Clemons testified that she later spoke several times with the Defendant on September 13, 2012, about his desire to retrieve his cell phone from her. Investigator Clemons stated that, during a phone call, the Defendant told her she could not look through the phone. Then the Defendant came to the police department to retrieve his phone, and Investigator Clemons spoke to him. During their conversation at the police department the Defendant told Investigator Clemons that the police could search his cell phone. Their telephone conversations and conversation at the police department were recorded. Officers took the Defendant into custody at the end of their conversation at the police department.

On cross-examination, Investigator Clemons agreed that, when she spoke to the Defendant by telephone on September 13, she knew there was another outstanding warrant for his arrest, issued that day, and she told him to come to the police department to pick up his cell phone. She agreed that she "intentionally misled" the Defendant. Investigator Clemons agreed that no criminal charges had resulted from the DCS investigation.

Investigator Clemons clarified that she took possession of the Defendant's cell phone on September 10, 2012, when the Defendant was arrested outside the hospital. She stated that she took the phone into possession "by consent for Investigator Wardlaw." She clarified that Investigator Wardlaw had informed the police department on the morning of September 10 that he had an ongoing investigation involving the Defendant and that it was "necessary for him to get possession of a phone that involved the investigation." Investigator Clemons did not know whether a search warrant had been issued for the Defendant's cell phone, but she reiterated that she had information that the Defendant had consented for Investigator Wardlaw to take possession of his phone.

Investigator Clemons denied searching the Defendant's cell phone between the date of confiscation, September 10, and when the Defendant came to the police department on September 13. She stated that, during that time, the cell phone was "locked in security in [her] office" to be held there until it was taken to "confiscations." Investigator Clemons testified that Ms. Blair told her that communications from the Defendant to Ms. Blair were stored on the Defendant's cell phone. Ms. Blair also told a police officer on September 5 that she received phone calls and texts from the Defendant

4

at the time of the DCS incident. Investigator Clemons stated, however, that she seized the cell phone for Investigator Wardlaw and placed it "on hold" for him.

Officer Jonathan Harris, an investigator in the KPD family crimes unit, arrested the Defendant on September 10, 2012, after initiating a stop of the Defendant's vehicle outside the hospital. Investigator Clemons and Officer Johnson had informed Officer Harris that the Defendant had assaulted Ms. Blair, was driving on a suspended license, and would be driving Ms. Blair to Fort Sanders Regional Hospital. Officer Harris heard over his police radio that Officer Johnson had observed the Defendant pull up to the hospital and described the vehicle driven by the Defendant. Once outside the hospital, Officer Harris observed the vehicle driven by the Defendant pulling away from the hospital entrance, and he initiated a stop of the Defendant's vehicle. Officer Harris pulled the Defendant, who was alone in the vehicle, out of the driver's seat, put him in handcuffs, and placed him on the curb. Officer Harris patted down the Defendant for weapons, and the Defendant told Officer Harris that there was a weapon inside the vehicle. Investigator Wardlaw arrived and transported the Defendant from the scene. Officer Harris looked in the vehicle and saw a gun halfway under the driver's seat. Investigator Clemons arrived and photographed the scene, including the vehicle, with the weapon inside. Officer Harris identified the photographs of the interior and exterior of the vehicle, including where the gun was located inside the vehicle.

On cross-examination, Officer Harris agreed that other than the Defendant illegally driving the vehicle, Officer Harris did not observe the Defendant commit any other criminal acts. Officer Harris stated that his weapon was unholstered when he pulled the Defendant out of the vehicle. Officer Harris testified that he did not have a copy of the driving on a suspended license warrant and had not seen it at the time of the Defendant's arrest. Officer Harris stated that he transported the gun found in the vehicle to the evidence locker at the police department. Officer Harris agreed that the family crimes unit typically did not conduct traffic stops, and he agreed that the officers' general practice did not include seizing a cell phone during a traffic arrest.

Officer Keith Johnson, also a member of the family crimes unit at the KPD, testified that Investigator Clemons informed him that police wanted the Defendant for questioning regarding injuries to Ms. Blair. Investigator Clemons had informed him that the Defendant would be driving to the hospital and that he had an outstanding warrant for his arrest for driving on a suspended license. Officer Johnson saw the vehicle driven by the Defendant pull up to Fort Sanders Hospital and drop off Ms. Blair; there was also a child in the vehicle. Ms. Blair and the child exited the vehicle at the hospital, and, as the Defendant drove the vehicle away from the hospital, officers present stopped the vehicle. Officer Johnson testified that he knew the vehicle would be searched "so [he] went and found the owner of the car, which was [Ms. Blair]." She

5

told Officer Johnson that she owned the vehicle and consented to a search of the vehicle. During the search, officers found a weapon under the driver's seat and a cell phone lying in the driver's seat.

On cross-examination, Officer Johnson testified that this traffic stop was the first one he had done since being assigned to the family crimes unit. Officer Johnson stated that he did not have his weapon unholstered when he stopped the Defendant's vehicle. Officer Johnson read aloud from the arrest warrant and stated that, in it, he had written that the officer who had opened the driver's side door observed a weapon inside the vehicle. Officer Johnson testified that he searched the passenger compartment of the vehicle. He could not remember who removed the weapon or the cell phone from the vehicle.

Investigator Brandon Wardlaw, an officer assigned to the KPD violent crimes unit, testified that he investigated the Defendant's possible involvement in several shootings that occurred in August 2012, including the August 10 shooting at Ms. West's and Mr. Harbison's home. He interviewed the Defendant on August 21, 2012, following a traffic accident; the interview was recorded. Investigator Wardlaw questioned the Defendant on his whereabouts and involvement with the August 10 shooting. During the August 21 interview, Investigator Wardlaw "found out that there was a phone call placed . . . right before the [shooting] and the phone call actually led to right into the beginning of the [shooting] also." Investigator Wardlaw stated that he did not get possession of the Defendant's cell phone during the August 21 interview. Officers arrested the Defendant at the conclusion of the interview.

Following the August 21 interview, Investigator Wardlaw continued to investigate the August 10 shooting, focusing particularly on the phone calls that were made immediately prior to the shooting. Investigator Wardlaw advised the other KPD officers that he needed to speak with the Defendant again and needed his cell phone to "make sure that any evidence on [the cell phone] wasn't destroyed." On September 10, 2012, Investigator Wardlaw learned that the Defendant was in custody at Fort Sanders Hospital. Investigator Wardlaw recalled that he told Investigator Clemons that morning that he needed to speak with the Defendant. After officers took the Defendant into custody in front of the hospital, he was transported to the police department where Investigator Wardlaw interviewed him.

At the beginning of the September 10 interview, Investigator Wardlaw informed the Defendant of his *Miranda* rights, and the Defendant agreed to waive those rights. During the interview, Investigator Wardlaw asked the Defendant if he could search the Defendant's cell phone, and the Defendant gave his permission. During the recording, the Defendant said, "You can search my phone." Investigator Wardlaw recalled that the

6

Defendant later stated he would look through the phone himself but would not let an officer look through the phone. At that point, Investigator Wardlaw did not have the Defendant's cell phone. Following the interview, Investigator Wardlaw sought an indictment from the grand jury for the August 10 shooting; a true bill was returned, and officers arrested the Defendant on September 13.

During cross-examination, Investigator Wardlaw testified that the Defendant had denied officers permission to search his cell phone during the August 21 interview. Investigator Wardlaw clarified that, during the August 21 interview, the Defendant's cell phone was with the Defendant's other belongings on Investigator Wardlaw's desk, in a different room from where the interview was being conducted. Because the Defendant denied officers permission to search his cell phone on August 21, despite having the cell phone in his office, Investigator Wardlaw decided to wait and speak to the Defendant on a separate occasion about looking through his cell phone. Thus, on September 10, Investigator Wardlaw informed other officers that he needed the Defendant's cell phone to prevent destruction of evidence stored on the cell phone. "Other suspects," including Carlos Campbell and LaQuinton Brown, previously informed Investigator Wardlaw that the cell phone contained information about the August 10 shooting. Another witness, Daisy Smith, had informed Investigator Wardlaw that she was speaking to the Defendant on the cell phone when the shooting occurred.

Investigator Wardlaw recalled that he procured a search warrant for the Defendant's cell phone but could not recall the date of the warrant and did not know exactly what he was looking for on the cell phone. Investigator Wardlaw stated that it was his understanding that the cell phone was not confiscated from the vehicle by Investigator Clemons until after Investigator Wardlaw had begun interviewing the Defendant and was given permission by the Defendant to look through the phone. "Once [the Defendant] gave [Investigator Wardlaw] permission, that's when [Investigator Wardlaw] got in contact with Investigator Clemons and told her hey, I need that phone."

Investigator Amy Jinks testified that as a major crimes investigator for the KPD she investigated a September 7, 2012 shooting of a fourteen-year-old at "Austin East." As part of her investigation of that shooting, she became "aware of an interview" with the Defendant. "Because of that interview with [the Defendant], . . . [Investigator Jinks] wanted to do a search warrant on [the Defendant's] cell phone." Investigator Jinks testified that, during that interview, the Defendant had made statements that one of the parties involved in the September 7 Austin East shooting called the Defendant about the gun that was used in the shooting, which was also the gun found inside the vehicle driven by the Defendant when he was stopped in front of the hospital on September 10. As such, Investigator Jinks prepared a search warrant for the Defendant's cell phone on October 23, 2012; Investigator Jinks identified the search warrant, and the trial court

admitted it as an exhibit. The warrant she prepared misidentified the cell phone's serial number, so she prepared a second warrant for the cell phone, signed November 12, 2012; the trial court also admitted this warrant as an exhibit. Another officer, Officer Ayub, performed the search of the cell phone and returned it to Investigator Jinks on November 16. The trial court entered into evidence Officer Ayub's report containing the cell phone's records.

On cross-examination, Investigator Jinks agreed that she was not present when Officer Ayub searched the Defendant's cell phone. She clarified that she looked through the cell phone before turning it over to Officer Ayub, and she saw videos, text messages, and phone calls. She did not make a report of what she saw.

At the conclusion of the hearing, the trial court made the following findings:

[O]n September 10th, 2012, the officers who stopped the [D]efendant knew of an outstanding warrant for his arrest and they also observed him violating the law by driving when they knew that his driver's license was suspended. So obviously the stop of the [D]efendant was perfectly valid.

. . . .

The Court would also find that the officers did get the owner's consent to search the vehicle and so had a right to know everything that was in the vehicle, including the [Defendant's cell phone]. . . . [Investigator] Clemons had information gleaned during an investigation in the event where the child was left unattended that there was an admission relating to the [D]efendant on the [cell] phone. That showed that there was evidence. The police have a duty, not just a right, but a duty to collect and preserve evidence and [Investigator Clemons] had a legitimate reason to believe that there was evidence pertaining to the leaving of the child unattended on the [cell] phone. That's another reason the police has a valid right to take possession . . . of the [cell phone].

Also, [Investigator Clemons] waited until [Investigator Wardlaw] got new consent from the [D]efendant to go through the [cell] phone, take the [cell] phone, go through the [cell] phone.

For those reasons the Court finds that the seizure of the [cell] phone was valid, the search of the contents of the [cell] phone were valid.

### 2. Weapons Seized Following August 21, 2012 Traffic Accident

The Defendant filed a second motion to suppress evidence seized following an August 21, 2012 traffic accident. During the investigation of the traffic accident, weapons were found inside a backpack in the trunk of the vehicle of the driver at fault; the Defendant was a passenger in that vehicle. At the suppression hearing, the State argued that the Defendant did not have standing to challenge the search of the vehicle involved in the August 21 traffic accident because he was not the owner or operator of the vehicle and, at the scene, he denied ownership of the guns. The Defendant argued that a recent change in the law allowed passengers to challenge searches of vehicles they were riding in and that he was unlawfully detained by police during their response to the traffic accident. The trial court took the matter under advisement and the parties submitted briefs in support of their arguments. The trial court considered the briefs and made the following ruling:

> It would be the Court's opinion that this does not involve a traffic stop at all. This was a car wreck [on August 21]. The police didn't stop [the vehicle that the Defendant was a passenger in]. The police didn't stop anybody. A car wreck stopped them. Police were called to the scene. So all of the analysis pertaining to what police can and cannot do at a traffic stop is not pertinent to this case. The only thing the Court would consider . . . I haven't heard enough evidence to say for sure that the police had probable cause to arrest the [D]efendant. But that would only affect any evidence found on him as a result of the arrest . . . . [T]he Court would find all analysis pertaining to a traffic stop does not apply and the search of the vehicle was based on probable cause and did not violate the [D]efendant's rights in any way. The owner or operator of the car could still argue it, but [the Defendant] was out of it at that point.
>
> . . . The [police] officer received a call, responded to the call of a traffic accident, a car wreck, and when [the officer] got there, he obviously began noticing things that made him suspicious and as he got suspicious he brought out the [drug] dog. The dog alerted [to the presence of drugs]. The other officer volunteered with the search. The automobile provides the exigent circumstance, so . . . this Court finds no constitutional violations of anyone's rights as a result of the search of that car . . . .

## B. Trial

At the Defendant's trial, prior to the State's opening statement, the Defendant objected to the use of "slides and banners in opening statement that we don't have preserved either before time or admissible." The Defendant stated that he wished to raise

this objection to preserve the issue for appeal, and the trial court agreed to make part of the record anything used by the State during its opening statement. During its opening statement, the State played a video contained on the Defendant's cell phone that the State argued showed the Defendant driving a vehicle and holding a .40 caliber gun and a passenger, LaQuinton Brown, holding a .9 millimeter gun with an extended clip in his lap. The State argued that these two weapons were used in the shooting at Ms. West's and Mr. Harbison's home.

The State then presented the following evidence: Michael Mayes testified that he worked at the Knox County Emergency Communications Office as a record keeper. The State then sought to introduce a recording of a 911 call under the hearsay exception of excited utterance. Mr. Mayes testified that the recording was made on August 10, 2012, at 2:00 p.m. and that the call came from the cell phone number 865-257-2781. On the recording, which the State played aloud for the jury, a woman identified herself as Oracle West and asked for an officer to respond to her residence. Ms. West stated that her house had been "shot up" by "a dude named Cuben Bailey." Ms. West stated that this person had previously called her and threatened to "shoot up" her house. She stated that she did not know why the man had "shot up" the house but acknowledged that the Defendant had a problem with her son. The dispatcher asked Ms. West if she was leaving the house, and Ms. West replied that she was not leaving but was moving her vehicle. Ms. West estimated that ten shots were fired. When asked if she had a safe place to wait for officers to respond, Ms. West replied that she did not know where a safe place would be and that she was afraid to go inside her house. She stated that the incident was "awful."

On cross-examination, Mr. Mayes agreed that the caller said in the recording that her house had been "shot up" but not that she had been shot "at." He agreed that the caller stated that no one had been injured. Mr. Mayes stated that the caller called 911 from a cell phone, as opposed to a landline.

Rachel Warren of the KPD testified that she was an evidence technician and that she responded to a shooting call at 1608 N. Fourth Avenue on August 10, 2012. She photographed the inside and outside of the house, as well as shell casings found at the scene. Officer Warren identified the photographs she took, including several photos of bullet holes on the outside of the house. She also identified several photos of bullet holes found inside the house, including in the bedroom wall and in the headboard of the bed inside the bedroom. Officer Warren stated that she then collected a total of fifteen shell casings from the scene, consisting of .380 caliber, .40 caliber, and .9 millimeter, and she also collected several bullet cores. She recovered nine .40 caliber casings, one .380 caliber casing, four .9 millimeter casings and one shell casing not identified in size.

At this point in the trial, outside the presence of the jury, the State informed the trial

court that it intended to call two lay witnesses to testify but that the witnesses were "terrified" and "concerned [about] who's going to protect them." The trial court questioned both witnesses, Daisy Smith and Oracle West, about their misgivings. Ms. Smith stated that she was not afraid but did not feel "comfortable with testifying" because she had kids. The trial court informed her that was "not a legal ground for refusing to testify." Ms. West stated that she had received her subpoena that day and was not told she would be testifying. She stated that she did not have any protection and that she had had too many "run-ins" with shootings. The trial court advised Ms. West that she had not offered a legal basis for refusing to testify. The trial court then asked the State if it intended to ask either of the witnesses any incriminating questions, and the State replied "No." The trial court then instructed the witnesses to testify.

In the presence of the jury, Daisy Smith testified that she had seen the Defendant in the streets but did not "hang out" with him. She testified that she had knowledge that the Defendant's mother's last name was "Bailey." Ms. Smith testified that Mr. Harbison was her cousin, and his mother was Ms. West.

Ms. Smith testified that on August 10, 2012, she received a phone call on her cell phone from the Defendant. The Defendant asked Ms. Smith to get in touch with her cousin, Mr. Harbison. Ms. Smith told the Defendant that she was not sure she could but that she would reach out to Ms. West in an attempt to contact Mr. Harbison. Ms. Smith then called Ms. West, with the Defendant on "three-way," and asked Ms. West if Mr. Harbison was home. Ms. West proceeded to call Mr. Harbison on "three-way," and so four people were on the phone call. When they were all on the phone call, Ms. Smith told Mr. Harbison that the Defendant wanted to talk to Mr. Harbison. The Defendant asked Mr. Harbison if he had any "beef" with the Defendant, and Mr. Harbison replied "no." The Defendant asked Mr. Harbison that same question three times and then asked Mr. Harbison where he was at that time. Then Ms. Smith heard what she first thought was static on the phone call, but she then assumed the sound was gunshots, and then the phone call ended.

Ms. Smith identified a phone number displayed as an incoming call on the Defendant's cell phone records, at 12:28 p.m. on August 10, 2012, as her phone number in August of 2012. The State showed Ms. Smith the photographs taken of the house, and she identified Ms. West's bedroom and bed, and Mr. Harbison's bedroom. Ms. Smith recalled that, after she hung up from the four-way call, she called Ms. West again but was not able to contact Ms. West until an hour after the four-way call.

On cross-examination, Ms. Smith testified that she had no idea if the Defendant was the person on the phone call. Ms. Smith agreed that she called the Defendant, after he initially called her, because the phone the Defendant called her from "went dead." She

agreed that she did not know whether the Defendant had shot Ms. West's and Mr. Harbison's house. Ms. Smith confirmed that Ms. West and Mr. Harbison were both at home during the call, in their separate bedrooms.

Oracle West testified that she was a diagnostic evaluator for emotionally disturbed children. She stated that Mr. Harbison was her son, and she did not know the Defendant. She testified that she had heard the Defendant's name through her jobs at various schools. Ms. West testified that she lived with Mr. Harbison on August 10, 2012, and that she owned two vehicles at that time, a Toyota and a Dodge. Mr. Harbison owned a Chevy. Ms. West stated that she did not want to testify.

Ms. West testified that on August 10, 2012, she received a phone call from someone who asked to speak to Mr. Harbison. Ms. West testified that she called Mr. Harbison on "three-way" but that she could not recall what was said during the conversation. She was in her bedroom at the time. At some point, gunshots started coming into her house, so she "hit the floor." "After everything was over," Mr. Harbison left the house. Ms. West called him repeatedly and then called 911. Ms. West got into her car to go and look for Mr. Harbison but decided to wait at the house for the police to arrive.

On cross-examination, Ms. West testified that she waited fifteen to twenty-five minutes after the shooting to call the police because she was "trying to calm [her] child down." She stated that she did not recall that the delay between the shooting and her call to 911 was an hour and a half. Ms. West stated that she did not know of any "beef" between the Defendant and Mr. Harbison. Ms. West agreed that she called the Defendant's phone one time after the shooting. She stated that she called Mr. Harbison multiple times after the shooting and after he left the house. Ms. West stated that she could not remember how soon after the four-way phone call the shooting started at her house.

On redirect-examination, Ms. West stated that, after the shooting, she was more concerned about calling Mr. Harbison than the police because she did not want her son to go out and do something "stupid."

KPD Officer Matt Peters testified that he came into contact with the Defendant on August 21, 2012, when the Defendant was a passenger in a vehicle involved in a minor traffic accident between two vehicles. When Officer Peters arrived at the scene of the accident, he observed the Defendant and the other occupants standing outside the vehicles. Officer Peters observed both vehicles, spoke to both drivers, and wrote a citation for the "at-fault" driver, Ms. Blair. The Defendant was a passenger in Ms. Blair's vehicle.

During the time that Officer Peters was at the scene of the accident, several other

officers arrived to assist. One officer brought a K-9 officer to the scene to perform a smell test for narcotics; the K-9 showed "positive" behavior that Ms. Blair's vehicle contained narcotics. During a subsequent search of Ms. Blair's vehicle, Officer Peters detected the smell of marijuana. He searched the trunk of the vehicle and located a black backpack containing three loaded weapons. Officer Peters identified in court the three weapons contained in the backpack. He identified one weapon as a "Ruger," which had been loaded with .9 millimeter bullets. He identified the second weapon as a "Makarel," which had been loaded with .380 caliber bullets. He identified the third weapon as a "Smith and Wesson," which was loaded with .40 caliber bullets.

On cross-examination, Officer Peters testified that there was minor damage to both vehicles from the accident. He agreed that he found drugs in the passenger compartment of Ms. Blair's vehicle and the weapons in the trunk. Officer Peters also found a "South College" student identification card belonging to "Christian Moore" inside the backpack and nothing that indicated that it belonged to the Defendant. Officer Peters stated the Defendant was transported from the scene to the police department where he was interviewed by Investigator Wardlaw before being released. During his interview with Investigator Wardlaw, the Defendant identified someone else as the owner of the backpack, but Officer Peters could not recall the name that the Defendant provided.

Officer Patricia Resig, a KPD firearms examiner, testified as an expert witness in the field of firearm identification and examination. Officer Resig examined the fired cartridge cases recovered from the scene of the August 10, 2012 shooting. She also examined the three weapons found inside the backpack, a Ruger P85, a Smith and Wesson SD40, and a Makarel KBI. Officer Resig testified that, based on her training and expertise, she could identify individual markings and characteristics on the fired cartridge casings or bullets and determine with one hundred percent scientific certainty whether they were fired from a specific gun. Based on the markings on the fired cartridge casings found at the scene, she determined that two of the fired .9 millimeter casings were fired from the Ruger and nine of the .40 caliber casings were fired from the Smith and Wesson.

Officer Resig testified that she had viewed "a video." It is unclear from the record which video Officer Resig viewed, however, she stated that she observed weapons in the video. Our review of the record indicates that multiple videos admitted into evidence depict the Defendant and other persons displaying or holding weapons. She stated the weapons depicted in the video were consistent with the Ruger and the Smith and Wesson guns she examined.

Investigator Shelley Clemons recalled responding to the scene where officers had stopped a vehicle driven by the Defendant at Fort Sanders Hospital on September 10, 2012. She photographed the vehicle and its contents, including a cell phone. She took

possession of the cell phone, a cell phone charger, and the Defendant's driver's license. She stored the cell phone in "Inventory Control."

Lieutenant Vincent Ayub testified that he worked in the KPD forensic unit and was admitted as an expert in cell phone examinations. Lieutenant Ayub examined the Defendant's cell phone and extracted information from it on November 15, 2012. The trial court admitted into evidence a report of the extracted information, which included a call log from the Defendant's phone, and list of contacts, and five video files modified or "finalized" on various days in August 2012. The court admitted the videos as exhibits.

On cross-examination, Lieutenant Ayub testified that the Defendant's cell phone number was 865-308-0222. On redirect-examination, Lieutenant Ayub confirmed that he had the ability to determine when the cell phone videos were created.

Investigator Brandon Wardlaw, a KPD officer, responded to the scene of the shooting on August 10, 2012 and spoke with Ms. West. He described finding shell casings on the ground outside the house and bullets inside the house. After speaking with Ms. West, Investigator Wardlaw returned to his office and began following up on some leads he had generated. Investigator Wardlaw agreed that he knew LaQuinton Brown, Tony Dixon, and Carlos Campbell from working as an investigator and stated that he could recognize the three men if he saw them in a photograph or video. Investigator Wardlaw stated that the Defendant's mother's last name was Bailey.

Investigator Wardlaw testified that he was aware of the weapons seized from the trunk of Ms. Blair's vehicle at the August 21, 2012 traffic accident. He was also aware that officers had seized the Defendant's cell phone, and Lieutenant Ayub had created a report on the contents of the cell phone, including the videos. The State showed Investigator Wardlaw one of the cell phone videos, and the video was played for the jury, during which Investigator Wardlaw identified the Defendant and Mr. Brown inside a vehicle. The two men were seated inside a car, driving around a neighborhood. In the video, the Defendant was holding a Smith and Wesson gun, which Investigator Wardlaw stated he thought looked like a .9 millimeter. The State showed Investigator Wardlaw the weapon seized from the vehicle during the traffic accident, and he identified an insignia on the weapon consistent with the weapon shown in the video. The State showed Investigator Wardlaw another cell phone video which was played for the jury. In the video, the Defendant was seen slowly driving a car, at night, while a woman hung onto the driver's side window frame from the outside of the car, conversing with the Defendant. Investigator Wardlaw stated that the Defendant was holding a weapon in his lap in this video. The State showed Investigator Wardlaw a third video which was played for the jury. and he identified the Defendant, Mr. Dixon, and Mr. Brown. In the video, the three men were shown walking around a neighborhood.

On cross-examination, Investigator Wardlaw agreed that he was the officer in charge of the investigation of the August 10, 2012 shooting. He agreed that officers did not find any fingerprints on the three weapons seized from the vehicle involved in the August 21, 2012 accident or on the cartridge casings recovered at the scene of the shooting. He agreed that he reviewed phone records from the Defendant's phone number. The State objected to the admission of the phone records without the record keeper present to lay the foundation for the records; the Defendant reserved further cross-examination of Investigator Wardlaw until after the phone records had been authenticated and admitted as evidence.

Lieutenant Steve Patrick testified that he was employed as a record keeper of inmate files and jail calls for the Knox County Sheriff's Office. He identified several portions of several phone calls made by the Defendant from the jail, the trial court admitted them into evidence, and the State played them aloud for the jury. We have listened to the portions of the phone calls and very little of what was said is intelligible. We have discerned from the calls and other evidence at trial that the Defendant wanted the woman to whom he was speaking, Ms. Blair, to get in touch with Tony Dixon and/or Mr. Dixon's mother and ask them to "help out" the Defendant by either not talking to the police or not coming to court.

The State rested its case and the Defendant moved for a judgment of acquittal on all counts of the indictment, arguing that there was insufficient identification of the Defendant as a participant in the August 10, 2012 shooting. The trial court heard further argument from both sides and denied the Defendant's motion.

On behalf of the Defendant, Clint Greene testified that he worked for AT&T as a records custodian and that he kept records for the phone number 865-308-0222, the Defendant's phone number. He identified the records for the time period of August 9-10, 2012; the trial court admitted those records into evidence. Mr. Greene testified that the phone records only showed incoming and outgoing calls, not three-way calls. Mr. Green testified that the Defendant's cell phone received a call at 12:28 p.m. on August 10, 2012, from a cell phone number registered to Ms. Smith. The "elapsed time" of the phone call was four minutes and two seconds. He reiterated that the records did not indicate whether this phone call was a three-way call. The next call the Defendant received was at 2:51 p.m. on August 10, 2012, from a phone number registered to Ms. West. The line remained "open" for 26 seconds. He testified that the Defendant never called Ms. West.

Ty Compton, a KPD officer, responded to Ms. West's and Mr. Harbison's house where he spoke with Ms. West. Ms. West told him that, prior to the shooting, she had received a call from someone named "Cub[e]n." The caller's phone number was blocked. Ms. West told Officer Compton that "right after . . . the phone hung up . . . shots rang out."

15

Ms. West told Officer Compton that her son, Mr. Harbison, and the Defendant knew each other and had "engaged in a prior incident" at a club. She said that Mr. Harbison had testified against the Defendant in the ensuing trial.

On cross-examination, the State played a video recording of Officer Compton's conversation with Ms. West. In the recording, Ms. West showed Officer Compton where the cartridge casings were on the ground outside her house. Officer Compton asked Ms. West if the Defendant had shot into her house, and she said that he had had problems with her son, Mr. Harbison, in the past. She stated that Mr. Harbison testified against the Defendant in juvenile proceedings. She told Officer Compton that she had received "a threat on the phone, and then all of sudden, 'bop, bop, bop,'" indicating gunfire. Ms. West stated that she was "on the floor" when the shooting happened. Ms. West told Officer Compton that there were bullets all through the house. She showed Officer Compton where she was lying on the floor when the shooting started. Ms. West said that the caller said to Mr. Harbison, "This is Cuben, you out [of jail] now." She said, "I guess they found out [Mr. Harbison] was out [of jail]." Ms. West stated that Mr. Harbison had driven away from the house after the shooting. She said that "all this was about" "whatever happened at the club" and that Mr. Harbison had testified in court about the club incident. Officer Compton testified that he recorded Ms. West's information and the information she provided about Mr. Harbison. He also walked around Ms. West's house and observed bullet holes and shell casings.

Investigator Wardlaw was recalled to testify by the Defendant. He testified that he investigated the blocked phone call to Ms. West that occurred immediately prior to the shooting. He obtained a search warrant for the cell phone number 865-308-0222, registered to the Defendant. Investigator Wardlaw was told that Ms. West received the call at 1:26 p.m. on the day of the shooting, so he checked the records for the 0222 number to determine whether any outgoing calls had been made at that time. The records reflected that no calls were made.

Investigator Wardlaw testified that he received information from Officer Compton that Ms. West had said the shooting was in retaliation for Mr. Harbison's testifying against the Defendant. Investigator Wardlaw agreed that, upon further investigation, he discovered that the incident at the club had occurred between Mr. Harbison, Mr. Brown, and Mr. Campbell and that the Defendant was not involved.

On redirect-examination, Investigator Wardlaw agreed that the Defendant was acquainted with Mr. Campbell and Mr. Brown. Investigator Wardlaw was shown a still-shot from the cell phone video showing the Defendant holding a gun and was asked to compare it to the gun seized from the vehicle at the August 21, 2012 accident. Investigator Wardlaw stated that both weapons were Smith and Wesson SD40 models and

16

had similar insignia on them.

At this point during the trial, the Defendant sought to introduce a letter from Mr. Harbison to his mother, Ms. West, in which he stated that Ms. West was not at the house when the shooting occurred and that he and the Defendant did not have any problems between them. The State objected, contending that the letter was hearsay and that it could not be admitted under any hearsay exceptions. The trial court agreed that the letter was hearsay and therefore inadmissible.

Based upon this evidence, the jury convicted the Defendant of attempted second degree murder, employing a weapon during the commission of attempted second degree murder, attempted first degree premeditated murder, employing a weapon during the commission of attempted first degree premeditated murder, and reckless endangerment.

## B.  Sentencing

At the sentencing hearing, the State introduced certified copies of the Defendant's prior convictions for misdemeanor assault and possession of marijuana and certified copies of the Defendant's prior juvenile adjudications for two counts of aggravated robbery and one count of conspiracy to commit aggravated robbery. After hearing the testimony and arguments of Counsel, the trial court sentenced the Defendant. The trial court stated:

> In this case a jury found the [D]efendant guilty in count one of attempted second degree murder, a class B felony. In count two of employing a firearm during the commission of a dangerous felony as set forth in [T.C.A. §] 39-17-1234[(h)(2)], which carries a 10 year minimum mandatory sentence. In count three the jury found him guilty of attempted first degree murder, a class A felony. In count four of employing a firearm during the commission of a dangerous felony as set forth in [T.C.A. § 39-17-1234(h)(2)], which carries a 10 year minimum mandatory sentence. And in count five of the offense of reckless endangerment by discharging a firearm into an occupied dwelling, a class C felony.

> When [the Defendant] was a juvenile [he] was adjudicated guilty of aggravated robbery [twice]. The State's attorney filed appropriate notice of the State's intent to rely upon those convictions to seek enhanced punishment of the [D]efendant.

> Aggravated robbery is a class B felony, . . . and this Court finds that the [D]efendant is a range [II] multiple offender. This Court rejects the [D]efendant's contention that his prior [juvenile] convictions should not be

17

used to enhance his sentences in the instant case because they could not have been so used at the time he was adjudicated guilty of those offenses, and to use them as enhancers now amounts to increasing his punishment for the prior offenses in violation of the ex post facto doctrine.

This Court finds that only in the instant case is his punishment being increased. The punishments he received for his past crimes are not increased or otherwise effected [sic].

. . . .

In determining the [D]efendant's sentence, the Court has considered the Presentence Report, the evidence presented at trial, the [D]efendant's record of criminal conduct, his social history, and the arguments of counsel. The Court finds enhancement factor [40-35-114(1)] applies. In addition to the two aggravated robberies used to enhance his range of punishment, the [D]efendant was convicted twice of assault at the age of 13, conspiracy to commit robbery at 14, a weapons offense at age 16, another felony involving a firearm at 17, and at age 18 he was convicted of assault, placed on probation and his probation was revoked.

The assault conviction involved three shots fired at a person. In the instant offense the [D]efendant stands convicted of firing multiple rounds into a dwelling knowing that at least two people were inside the dwelling.

The offense of reckless endangerment involved more than one victim. Because of his revoked probation, enhancement factor [40-35-114(8)] applies. Use of a firearm is not an element in count one and three, so enhancement factor [40-35-114(9)] applies in this count.

Clearly, the [D]efendant had no hesitation about committing a crime when the risk to human life was high. There were 15 empty shell casings found in front of Oracle West's home.

About all that can be said in mitigation is that the [D]efendant never knew his father, and his mother was crack addict he knew mostly on the streets. Most of his life has been spent being passed back and forth by relatives, and time in institutions.

With regard to the manner of service of the multiple sentences, the Court must note that the [D]efendant is an offender whose record of criminal

activity is extensive. The Court must also find that the [D]efendant is a dangerous offender who[se] behavior indicates little or no regard for human life, and no hesitations about committing [a] crime in which the risk to human life is high. And

(a) The circumstances surrounding the commission of the offense are aggravated. The [D]efendant fired multiple rounds into a dwelling immediately after talking to Oracle West, and knowing she was in the dwelling.

(b) confinement for an extended period of time is necessary to protect society from the [D]efendant's unwillingness to lead a productive lifestyle, and the [D]efendant's resort to criminal activity in furtherance of anti-societal lifestyle. The [D]efendant has virtually no verifiable work history, and his life consists of guns and violence. And

(c) The aggregate length of the sentence reasonably relates to the offenses of which the [D]efendant has been convicted. His continued commitment to guns and violence requires an extended period of incarceration for the protection of the community.

Accordingly, the Court does sentence the [D]efendant to serve 15 years as a range two offender in count one. Ten years in count two consecutive to count one. Thirty years as a range two offender in count three, consecutive to count two. Ten years in count four consecutive to count three. And eight years as a range two offender in count five, concurrent with count four.

The trial court imposed a total effective sentence of sixty-five years.

### D. Motion for New Trial

The Defendant filed a motion for new trial, alleging, relevant to this appeal, that the trial court should grant his motion based on "the recantation by Oracle West in which she state[d] she was not present when her house was shot" and that Mr. Harbison's letter supporting her recantation should have been admitted. At the motion for new trial hearing, Ms. West was present and represented by counsel. When questioned by the trial court, Ms. West's counsel advised that Ms. West would "take the Fifth" and would not take the witness stand willingly. The trial court inquired as to whether Ms. West had signed a sworn statement recanting her testimony, and defense counsel replied that Ms. West had been interviewed and given a recorded statement. The trial court stated that the Defendant

could put on evidence of the recantation, including the recorded statement, but stated that a recantation required "sworn testimony on the stand or a sworn affidavit." It further stated that evidence of what Ms. West had said "outside the courtroom, when not under oath" did not amount to a recantation. The trial court then declined to hear any further evidence, stating that since Ms. West refused to testify or submit a sworn affidavit recanting her testimony it would not make a finding that she had recanted her trial testimony. A transcript of Ms. West's recorded interview and a transcript of a voicemail left by Ms. West on defense counsel's telephone were entered into the record as exhibits.

Mr. Harbison testified that he had written the letter stating that Ms. West was not present at the time of the shooting. He testified that he would have testified at the Defendant's trial; however, he had been charged with a criminal offense in another case. Mr. Harbison could not remember if his attorney told him not to testify, and he recalled being subpoenaed to testify but was never brought to court.

On cross-examination, Mr. Harbison agreed that he did not have any charges pending against him at the time of the August 10, 2012 shooting. He agreed that he came to court and wrote the letter in July of 2013, when the Defendant's attorney was present. He stated that he would have testified in the Defendant's trial had the Defendant's attorney asked him to testify. The trial court denied the Defendant's motion on this ground and concluded as follows:

> Well, the Court would find that . . . [Mr. Harbison's] letter constitutes a statement made outside the court, . . . that was offered in court to prove the truth of the assertion contained within it. Classic hearsay.
>
> The evidence that has come to the Court is that . . . introduction of the letter is not the only way to present that evidence. That, in fact, Mr. Harbison was willing to come to court and testify. He was not unavailable.

It is from these judgments that the Defendant now appeals.

## II.  Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to suppress a cell phone seized during a traffic stop and weapons seized during a traffic accident investigation; (2) the trial court erred when it allowed the State to play a video recording during its opening statement; (3) the trial court erred when it instructed two witnesses, without first appointing counsel, to testify against the Defendant after the witnesses invoked their Fifth Amendment right to remain silent and when it allowed the

State to make an inappropriate comment in front of the jury on this matter; (4) the trial court improperly admitted into evidence the first victim's 911 call, images of the Defendant near or displaying firearms, and the Defendant's jail call, and improperly declined to admit into evidence the second victim's letter to the first victim; (5) the evidence is insufficient to sustain any of his convictions; (6) the trial court erred when it failed to grant a new trial based on a witness's recantation; (7) the trial court erred when it instructed the jury regarding the truthfulness of witnesses and criminal responsibility; (8) the trial court erred when it denied the Defendant's motion for judgment of acquittal; (9) the trial court erred when it sentenced the Defendant; and (10) due process requires a reversal of the Defendant's convictions because of the effect of cumulative error.

## A. Motions to Suppress

The Defendant appeals the trial court's denial of his motion to suppress the cell phone seized during the traffic stop and the weapons seized during the traffic accident. Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

## 1. Cell Phone

The Defendant contends that the trial court erred when it denied his motion to suppress the cell phone seized from the vehicle driven by the Defendant during the September 10, 2012 traffic stop outside the hospital. He argues that because he was handcuffed beside the vehicle and could not access the phone and because the phone did not contain evidence of his offense of driving on a suspended license, the phone was illegally seized. He further contends that the subsequent search of the cell phone, conducted without a valid warrant, was illegal. The State responds that the owner of the

vehicle, Ms. Blair, gave consent for the search of the vehicle and that the cell phone was "lawfully collected . . . as part of a consent search following the [D]efendant's lawful arrest" on September 10, 2012. The State contends that the Defendant gave Investigator Wardlaw permission to search his cell phone, and Investigator Wardlaw relayed that consent to Investigator Clemons, who was on the scene of the arrest.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. Tennessee's constitutional protections regarding searches and seizures are identical in intent and purpose to those in the federal constitution. *State v. Turner*, 297 S.W.3d 155, 165 (Tenn. 2009).

In evaluating the constitutionality of warrantless searches, this Court must "evaluate the search or seizure under traditional standards of reasonableness" by balancing an individual's privacy interests against legitimate governmental interests. *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 630 (Tenn. 1997). Some of these recognized exceptions include search incident to arrest, plain view, search under exigent circumstances, and consent to search. *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (citing *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005)). The State has the burden to demonstrate, by a preponderance of the evidence, that a warrantless search passes constitutional muster. *State v. Harris*, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008). A search conducted pursuant to consent is constitutionally valid, but the consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting *State v. Brown*, 836 S.W.2d 530, 547 (Tenn.1992)). Even if consent is voluntary, the search must not exceed the scope of the consent, or evidence seized as a result of the search will not be admissible. *See generally* 3 Wayne R. LaFave, Search and Seizure, § 8.1(c) (3d ed.1996).

In the present case, the trial court found that officers obtained consent to search the vehicle and that Investigator Clemons had a legitimate reason to believe that there was evidence pertaining to the DCS investigation on the cell phone. The trial court also found that Investigator Wardlaw had the Defendant's consent to search the cell phone and that Investigator Wardlaw relayed that information to Investigator Clemons. The trial court found that the seizure of the cell phone was legal based on the Defendant's consent.

We conclude that the evidence does not preponderate against the trial court's

findings. Officer Johnson testified that, after the vehicle driven by the Defendant was stopped and the Defendant was out of the vehicle, Officer Johnson went inside the hospital to ask the vehicle's owner, Ms. Blair, if she would consent to a search of the vehicle. Officer Johnson stated that Ms. Blair gave consent to search the vehicle. Investigator Clemons testified that, upon seeing the cell phone in the driver's seat and having been advised by Investigator Wardlaw that he had the Defendant's permission to search the phone, she seized the cell phone for Investigator Wardlaw's use. She also testified that, in her investigation of the DCS complaint involving the Defendant leaving Ms. Blair's child unattended, Investigator Clemons had information from Ms. Blair that evidence supporting that complaint would be on the Defendant's cell phone. Accordingly, we conclude that the cell phone was lawfully seized based on the vehicle's owner's consent to search the vehicle and that the cell phone was searched pursuant to the Defendant's consent which he gave to Investigator Wardlaw. The Defendant is not entitled to relief on this issue.

## 2. Weapons

The Defendant contends that the trial court erred when it denied his motion to suppress weapons seized during the August 21, 2012 accident investigation and search of the vehicle in which the Defendant was a passenger. He alleges that the trial court erred in concluding that the Defendant "lacked standing to challenge the search." He further alleges that he was seized pursuant to a "traffic stop" at the accident investigation and argues that a traffic accident investigation is "indistinguishable" from a traffic stop initiated by law enforcement. The State responds that the Defendant lacked standing to challenge the search of the vehicle involved in the August 21, 2012 collision because he failed to prove by a preponderance of the evidence that he had a legitimate expectation of privacy in the areas searched.

A "consensual police-citizen encounter," such as an accident investigation, can become a seizure, "thereby triggering a constitutional analysis of the police action," however, not all encounters between police and citizens are considered seizures, particularly if they are voluntary or consensual, and those encounters are not protected by the United States or Tennessee Constitutions. *State v. Williams*, 185 S.W.3d 311, 315-16 (Tenn. 2006); *State v. James Dewey Jensen Jr.*, No. E2002-00712-CCA-R3-CD, 2002 WL 31528549, at *3 (Tenn. Crim. App., at Knoxville, Nov. 15, 2002), *no Tenn. R. App. P. 11 application filed*. A consensual encounter becomes a seizure when an officer "has in some way restrained the liberty of a citizen." *Id.* at 316.

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have

23

communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Id.* (citing *Bostick*, 501 U.S. at 439); *see also Michigan v. Chesternut*, 486 U.S. 567, 572-73 (1988). A law enforcement officer does not violate the Fourth Amendment by merely approaching a person in a public place and posing a question. *United States v. Drayton*, 536 U.S. 194, (2002). Even if an officer has no basis for suspecting a crime is being committed, he or she may pose questions or ask for identification, provided he or she does not induce cooperation by coercive means. *Id.*; *see State v. Daniel*, 12 S.W.3d 420, 425 (Tenn. 2000).

Addressing the Defendant's argument that Officer Peters's response to the traffic accident was indistinguishable from a traffic stop for Fourth Amendment purposes and that the Defendant was not free to leave the scene, the trial court determined that Officer Peters did not stop the vehicle in which the Defendant was a passenger but was called to the scene of a traffic accident. The trial court found that Officer Peters's suspicions were aroused by the smell of narcotics and thus he had probable cause to further prevent the vehicle from leaving the scene and then search the vehicle. Based on the fact that the officer was called to the scene, the trial court concluded that a traffic stop analysis pursuant to the Fourth Amendment did not apply.

We conclude that the evidence presented does not preponderate against the trial court's denial of the Defendant's motion to suppress. Officer Peters was called to the scene of the traffic accident, presumably by one of the motorists, and he responded to conduct an investigation. As such, the officer had a right to be present at the scene, and his investigation did not amount to a traffic stop. When describing the interaction between police officers and citizens on public highways, the United States Supreme Court noted:

Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers ... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

24

*Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). These community caretaking or public safety functions do not involve coercion or detention, rather a police officer may initiate a conversation with a citizen and ask questions as long as the citizen is willing to answer the questions. *State v. Hawkins*, 969 S.W.2d 936, 939 (Tenn. Crim. App. 1997). This type of encounter is a consensual encounter, which does not require probable cause or reasonable suspicion. *Id.*

When Officer Peters approached the Defendant about the accident, he was engaged in a "community caretaking function," which was "totally divorced from the detection, investigation, or acquisition of evidence" relating to an offense. *Cady*, 413 U.S. at 441. We conclude that the initial contact between the Defendant and the officer did not constitute a seizure but rather a consensual encounter.

Turning to the Defendant's argument regarding standing to challenge the search of the vehicle, this Court, citing *Rakas v. Illinois*, 439 U.S. 128 (1978), for the conclusion that "Fourth Amendment rights are personal rights which, . . . may not be asserted vicariously," has held that a defendant, who "made no claim of ownership or other interest in the automobile searched," "made no assertion that he owned or had any possessory rights to the items seized," and "made no showing that he had any legitimate expectation of privacy in the areas searched," lacked standing to contest the search of the automobile. *Schultz v. State*, 584 S.W.2d 223, 225-26 (Tenn. Crim. App. Jan. 25, 1979).

At the motion for new trial, the trial court found that the Defendant had failed to establish standing to challenge the seizure of the weapons found in the backpack in the trunk of the car. The evidence does not preponderate against the trial court's ruling. Officer Peters testified that he responded to the scene of a traffic accident and that the Defendant was a passenger in Ms. Blair's vehicle, which was involved in the accident. The Defendant told Officer Peters and Investigator Wardlaw that the backpack in which the weapons were found did not belong to him. Accordingly, we conclude that the Defendant did not have a legitimate expectation of privacy in the vehicle searched, or its contents, and thus lacked standing to challenge the search of Ms. Blair's vehicle. The Defendant is not entitled to relief on this issue.

## B. Opening Statement

The Defendant next contends that the trial court erred when it allowed the State to play a video during its opening statement. He contends that the State played the video during the opening statement before it had been introduced into evidence and without notifying defense counsel of the State's intent to play the video, which "violated clearly

established rules regarding opening statements and effectively transformed [the opening statement] to witness testimony that introduced evidence." The State responds that, although the Defendant objected before the opening statement to the showing of slides or videos during the opening statement, he did not object to this particular video. The State argues that he cannot show that the trial court abused its discretion when it resolved his pre-statement objection and that, because he made no contemporaneous objection to this video, any further objection is waived.

In general, the scope of opening and closing arguments is subject to the trial court's discretion. Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). Argument, however, must be temperate, "predicated on evidence introduced during the trial," and relevant to the issues being tried. *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994). Thus, the State must not engage in argument designed to inflame the jurors and should restrict its comments to matters properly in evidence at trial. *State v. Hall*, 976 S.W.2d 121, 158 (Tenn. 1998). Typically, when a prosecutor's statement is not the subject of a contemporaneous objection, the issue is waived. Tenn. R. Crim. P. 33 and 36(a); *see also State v. Thornton*, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); *State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that the failure to object to the prosecutor's alleged misconduct during closing argument waived later complaint).

Prior to the State's opening statement, the following exchange occurred:

Defense counsel: Your Honor, we're going to object to any use of slides and banners in opening statement that we don't have preserved either before time or admissible. Otherwise because we don't have a way to raise potential issues on appeal.

Trial court: I'm sorry, you're objecting what now?

. . . .

Trial court: Okay. I've got to let [the State] make [its] opening statement and then you can open your proof but [defense counsel is] wanting to have this [video] while you're using it in opening statement. . . . .

Defense counsel: Well, Your Honor, I just want to have [the video] preserved so that we're not just looking at stuff up on the board and having no record [of it.]

26

Trial court: Well, how about this? How about as soon as [the State has] used it [they] introduce it as an exhibit?

Prosecutor: Yes.

Trial court: It will be part of the record.

Prosecutor: I can do that.

Trial court: That way you'll have the same access [to the video that the State] does.

Defense counsel: That's fine.

The State then proceeded with its opening statement and no other objections were made by the Defendant. We agree with the State that the Defendant has not shown that the trial court abused its discretion when it resolved the Defendant's objection. It appears from the record that the Defendant objected to use of the video out of concern that the video would not be part of the record on appeal. Thus, the trial court suggested and the State agreed to make the video an exhibit immediately after its use during the State's opening statement. The Defendant stated that he was satisfied with this solution and made no further argument about the video or its contents.

The Defendant's objection, that the video would not be part of the record on appeal, was resolved by the trial court and no further objection was made. On appeal, the Defendant now argues that the video amounted to witness testimony. We conclude that this argument is waived because the Defendant failed to make this specific objection at trial and cannot raise it for the first time on appeal. *State v. David Burrows*, No. W2014-01785-CCA-R3-CD, 2016 WL 154728, at *4 (Tenn. Crim. App., at Jackson, Jan. 12, 2016) (citing Tenn. R. App. P. 36(a)); *State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987)), *no perm. app. filed*. The Defendant is not entitled to relief on this issue.

### C. Ms. West's and Ms. Smith's Testimony

The Defendant next contends that the trial court erred when it instructed Ms. West and Ms. Smith to testify against the Defendant, after they stated that they wished to assert their Fifth Amendment right against self-incrimination, without first appointing counsel for each of them. He contends that this effectively coerced them to testify. The State responds that neither of the witnesses invoked their Fifth Amendment right against self-incrimination or indicated that their testimony might be self-incriminating. The

27

State argues that the witnesses merely indicated their apprehension about testifying because of safety concerns.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." *See also* Tenn. R. Evid. 501 ("Except as otherwise provided by constitution, . . . no person has a privilege to . . . refuse to disclose any matter."). This Amendment and the corresponding rule permit a witness to refuse to disclose any matter upon assertion of the right against self-incrimination. However, "a witness has no right to refuse to answer any and every question asked him in a judicial proceeding. He has only the right to invoke the Fifth Amendment with respect to matters that will incriminate him." *State v. Stapleton*, 638 S.W.2d 850, 855 (Tenn. Crim. App. 1982). The trial court has the discretionary authority to determine "whether a witness has properly invoked his fifth amendment right against self-incrimination." *State v. Zirkle*, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995). This Court will reverse the trial court's decision for an abuse of discretion. *Id.*

At trial, the State informed the trial court that Ms. West and Ms. Smith were "terrified" about testifying, and defense counsel stated that the witnesses had informed him that they did not want to testify. The trial court questioned Ms. West and Ms. Smith, and the following exchange occurred:

> Trial court: Now, let me address Ms. Smith specifically. What is it you're afraid of, Ms. Smith?
>
> Ms. Smith: . . . I'm just not afraid, I mean, I just don't feel comfortable with testifying . . . because I mean, I have kids out here. . . . And, I mean, I don't feel comfortable with getting on the stand and testifying against no one.
>
> Trial court: I understand and you will only be asked to tell the truth, whatever that is.
>
> Ms. Smith: I mean, I understand that too, but . . . .
>
> Trial court: Well, the thing is that's not a legal ground for refusing to testify. This Court does not want to hold either of you ladies in contempt of court. I understand that you're struggling, you're frightened . . . . But, again, I have to tell you the concerns you're raising are not a legal basis to refuse to testify. Ms. West, what reason do you have for not testifying?

28

Ms. West:   . . . I just got a subpoena today at 1:45 I guess to come in.   I wasn't aware that . . . I was going to be testifying.   . . .

Trial court:   Okay.

Ms. West:   And now all of a sudden I'm subpoenaed to court.   . . .   And I'm by myself and I don't know . . . the situation on what's out there or whatever.   . . .   KPD cannot protect me 24 hours or 24/7 a day.   They cannot protect me.   Okay.   I've had too many run-ins with shootings.   I've had too much going on with me.

. . . .

Trial court:   All right.   Well, again, all I can tell you is that's not a legal basis to refuse . . . to come to court and testify.   Both sides have the right of compulsory process to bring their witnesses in.   This time it's the State, another time it would be the defendant.   . . .   Let me ask this, does the State have any intention of asking any questions that may lead to any kind of self[-]incrimination?

Prosecutor:   No, Your Honor.

At this point, the Defendant objected to "the Court instructing witnesses that they have to talk."   The trial court responded that it would "insist" that Ms. Smith and Ms. West testify because they had offered no legal basis for the trial court to excuse them from doing so.

We disagree with the Defendant's assertion that the trial court's instructing the witnesses to testify violated their Fifth Amendment right against self-incrimination.   At no time during the proceedings did either witness invoke her right to remain silent, and the State made clear that it had no intention of asking the witnesses questions that might incriminate them in future criminal proceedings.   We reiterate that "a witness has no right to refuse to answer any and every question asked him in a judicial proceeding," but may only "invoke the Fifth Amendment with respect to matters that will incriminate him."   *Stapleton*, 638 S.W.2d at 855.   Neither witness expressed their belief that their testimony might incriminate them; they merely said they were afraid to testify.   As such, we conclude that the trial court did not abuse its discretion when it instructed the witnesses to testify and that the instruction did not violate their Fifth Amendment rights.   The Defendant is not entitled to relief on this issue.

### D.   State's Comment Regarding Jury-Out Hearing

The Defendant also contends that the trial court erred when it allowed the State to comment about the jury-out hearing, in front of the jury, regarding whether Ms. West and Ms. Smith wanted to testify. The State responds that the Defendant has not shown that the trial court abused its discretion when it denied his motion for a mistrial based on the prosecutor's comments about the jury-out hearing.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). One description of manifest necessity is that, "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached," a mistrial must be declared. *Id.* Additionally, a manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). This Court will not disturb that decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

After the jury-out hearing regarding Ms. Smith's and Ms. West's willingness to testify, Ms. West took the stand and testified that she did not want to testify and did not want to be in court. Ms. West testified that she had already informed the trial court that she did not want to testify and the State responded, "That's what we did during the break," meaning during the jury-out hearing. At this point, defense counsel motioned for a mistrial, arguing that it was inappropriate for the State to refer to something that had occurred outside the jury's presence. The trial court denied the motion. At the motion for new trial hearing, the trial court ruled that the State did not make any improper comments about what had occurred during the jury-out hearing.

We conclude that the trial court did not abuse its discretion when it denied the Defendant's motion for mistrial, as there was no manifest necessity for such an action. While it was improper for the State to comment about what had occurred during the jury-out hearing, Ms. West's testimony during the jury-out hearing was essentially the same as her testimony in front of the jury. The State's comment did not present anything to the jury other than matters to which Ms. West testified. As such, the State's comment did not affect the ability of the jury to decide the case fairly. The Defendant is not entitled to relief on this issue.

## E. Admission of Evidence

The Defendant next contends that the trial court abused its discretion by admitting

the following items of evidence: (1) Ms. West's 911 call; (2) videos and pictures showing the Defendant near or displaying firearms; and (3) the Defendant's jail calls to Ms. Blair. The Defendant also contends that the trial court erred when it declined to admit into evidence a letter from Mr. Harbison. The State responds that the Defendant has shown no reversible error as to these issues.

"Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) provides as follows:
Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Where the trial judge has substantially complied with procedural requirements, the standard of review for the admission of bad act evidence is abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

### 1. 911 call

The Defendant contends that the trial court improperly admitted Ms. West's 911 call because it was a hearsay statement and did not qualify under the excited utterance exception to the rule against hearsay. He contends that Ms. West's statements to the 911 operator "were not made while Ms. West was still under the stress or excitement of a startling event or condition." He contends that the proof at trial showed that the shooting happened near the time of the four-way call involving the Defendant and Mr. Harbison, at approximately 12:30 p.m., and that Ms. West did not call 911 until 2 p.m. The Defendant argues that this "temporal delay," coupled with Ms. West's "extreme calm" during the call, "more than suggest" that Ms. West was not making the 911 under excitement or duress. The State responds that the proper test for whether Ms. West's phone call qualifies as an excited utterance is not the time delay but whether her statement was spontaneous and logically related to the shooting. The State argues that Ms. West remained under the stress or excitement of the shooting when she called 911.

Pursuant to Rule of Evidence 803(2), the hearsay rule does not exclude "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). "Underlying the excited utterance exception is the theory that 'circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.'" *State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (quoting *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)). Three requirements must be met for a statement to qualify as an excited utterance:

> The first requirement is a startling event or condition that suspends the normal, reflective thought processes of the declarant. Second, the statement must relate to the startling event or condition. This broad requirement offers considerable leeway such that the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition. The third and final requirement dictates that the declarant make the statement while under the stress or excitement from the event or condition. This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*Id.* (footnotes, citations, and internal quotation marks omitted). The excited utterance

32

exception also has a competency requirement where "the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." *Land*, 34 S.W.3d at 529. The "'ultimate test'" of whether a statement is admissible within the excited utterance exception is "'spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.'" *Franklin*, 308 S.W.3d at 823 (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

At trial, the 911 recording was played aloud for the jury. In it, Ms. West requested that police respond to her residence, which she stated had been "shot up." Ms. West said she was afraid, that the incident was awful, and that she did not know where to go that was safe. Ms. West testified later that she called 911 after her house had been shot at but that she first called her son, Mr. Harbison, repeatedly to make sure he did not do anything in reaction to the shooting. She also stated that she was "trying to calm [her] child down." She said that this was the reason she delayed in calling 911 after the shooting had occurred. The trial court overruled the Defendant's objection to the admissibility of the call, stating that the introduction of the call was permissible under the rules of evidence. At the motion for new trial hearing, the trial court stated that the "content of the [911] call indicates excitement" and stated that Ms. West was "definitely" upset about her house being "shot up."

We conclude that Ms. West's 911 call qualifies as an excited utterance and that the trial court properly admitted the call under the corresponding hearsay exception. The call clearly related to a startling event, having her house "shot up," and, although Ms. West does not sound overly excited or stressed on the recording, during the call she said she was afraid and sounded as if she was still under the influence of the stressful nature of the shooting. The alleged delay between the shooting and the 911 call is only one factor to be considered by the trial court when determining whether to admit the statement. *See Franklin*, 308 S.W.3d at 823. Furthermore, Ms. West provided a plausible explanation for her delay in making the call: that she was actively attempting to contact Mr. Harbison to prevent further incident. As such, we conclude that the trial court did not abuse its discretion when it admitted the 911 call under the excited utterance hearsay exception.

### 2. Images of the Defendant with Weapons

The Defendant next contends that the trial court erred when it admitted photographs and videos showing the Defendant near or displaying firearms. He contends that the images were highly prejudicial and irrelevant and that they suggested bad character and a propensity to commit a shooting crime and should have been

excluded pursuant to Tennessee Rule of Evidence 403. The State responds that this evidence was "certainly relevant to help establish the [D]efendant's identity as the perpetrator of the shooting" because the guns displayed matched the gun used in the shooting. The State further responds that the Defendant cannot show that the prejudicial impact of the images substantially outweighed the probative value of the evidence.

Generally, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Price*, 46 S.W.3d 785, 815 (Tenn. Crim. App. 2000) (citing *Banks*, 564 S.W.2d 947, 951)). Photographs or videos must be relevant to prove some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the defendant. *Id.* "Excluding relevant evidence under [Tennessee Rule of Evidence] 403 is an extraordinary remedy that should be used sparingly, and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) (citations omitted).

During Officer Resig's testimony, the State sought to play a video of the Defendant holding weapons to allow Officer Resig to compare the weapons to those she had examined. The Defendant objected to the video's foundation, and the trial court overruled the objection. During Investigator Wardlaw's testimony, the State sought to introduce several videos, presumably including the one shown to Officer Resig, and a hearing on their admissibility was held outside the jury's presence. During the hearing, the State informed the trial court that the videos contained dialogue about the Defendant's gang membership, which it argued was evidence of motive to kill Mr. Harbison, who was allegedly in a rival gang, and was relevant to the evidence that the Defendant threatened Mr. Harbison during the three-way call. The Defendant argued that gang membership was not admissible evidence and that the videos contained hearsay and evidence of bad character. The trial court found that this evidence was prejudicial and of little probative value and that the connection between gang membership and the Defendant's charges was too tenuous. The trial court did allow portions of the videos to be played to allow Investigator Wardlaw to identify the Defendant, Mr. Dixon, and Mr. Brown in the videos; the Defendant did not further object. Investigator Wardlaw was re-called to the stand, and he compared the weapons in the videos to those used in the shooting; the Defendant objected to this comparison, arguing that Investigator Wardlaw was not a firearms expert. The trial court stated that Investigator Wardlaw's testimony was admissible, so long as he was making comparisons between the images and the actual weapons. At the motion for new trial hearing, the trial court stated that the images were "highly probative because [they were] one of the main things that connected

34

the [D]efendant to the weapon that was used in the crime." The trial court further stated:

> And all [the images] showed [were] the [D]efendant in possession . . . of the weapon. It was not proof that he committed a bad act. . . . [S]ome people may regard it as bad to be carrying around weapons. And . . . it might have conveyed carrying a weapon with the intent to go armed. It looked like they were kind of just goofing off, playing around with the weapon. They were laughing. They were cutting up.
>
> So the Court would find that . . . any danger of unfair prejudice was very slight and would definitely be outweighed by the probative value of the evidence.

We agree with the State that the images were relevant to establish that the Defendant was the perpetrator of the August 10, 2012 shooting, an element of the State's case. The firearms examiner examined the weapons seized from the vehicle in the traffic accident, as well as the cartridge casings recovered from the scene. She also viewed the images complained of by the Defendant. The examiner then testified that the casings had been fired from those weapons and that the weapons looked like the ones depicted in the images. In our view, these images were highly probative to establish that the Defendant either owned or had access to the weapons that were used in the August 10, 2012 shooting and made it more likely than not that he was connected to or the perpetrator of the shooting. The trial court did not abuse its discretion when it allowed these images to be admitted. The Defendant is not entitled to relief on this issue.

### 3. Jail Calls

The Defendant contends that the admission of his jailhouse telephone calls to Ms. Blair was error and that the State was either attempting to improperly introduce character evidence or improperly "circumvent the trial court's ruling" and introduce evidence of the Defendant's gang affiliation. He contends that the jail calls contained no evidence of the alleged crimes. The State responds that the calls presented evidence for a reasonable juror to infer that the Defendant was attempting to intimidate a witness and that such evidence is admissible under *State v. Rodney Williams*, No. W2014-00251-CCA-R3-CD, 2015 WL 2258303 (Tenn. Crim. App., at Jackson, May 13, 2015), *no perm. app. filed*.

The Defendant's brief cites to Lieutenant Patrick's testimony regarding when the State sought to introduce the redacted jail calls. The Defendant made no objection to

their admissibility at that time. The State then played portions of the calls during its closing argument, and the Defendant objected and contended that the State had played a portion that had not been previously admitted. The State contested this assertion and argued that it was only playing the portions of the calls that had been introduced. The trial court admonished the State to play only portions that had been previously introduced. During the motion for new trial hearing, the Defendant argued that the phone calls were not relevant for any purpose and should not have been admitted because of the references to gang membership in the calls. The State responded that, during the phone calls, the Defendant mentioned Mr. Harbison and Ms. West and trying to communicate with them. As such, the State argued that the calls were relevant to the issue of identity. The trial court noted that it had held a jury-out hearing and ruled that "gang-related" evidence was inadmissible. The trial court stated that there was no mention of gang activity on the phone calls and declined to order a new trial on that basis.

On appeal, the Defendant contends that the jail calls were improper character evidence of the Defendant's gang activity or membership. Our review of the phone calls reveals no overt mention of gangs or any of the Defendant's prior bad acts. The trial court followed the proper procedure in determining whether the calls improperly introduced character evidence in violation of 404(b). As such, we determine that the trial court did not abuse its discretion when it allowed the jail calls to be admitted into evidence.

### 4.   Mr. Harbison's Letter

The Defendant next contends that the trial court erred when it declined to admit into evidence a letter written by Mr. Harbison pursuant to the statement against interest exception to the rule against hearsay. He further contends that the letter "should have qualified as a statement 'offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness,'" pursuant to Tennessee Rule of Evidence 804(b)(6). The State responds that the Defendant did not establish Mr. Harbison's unavailability.

Tennessee Rule of Evidence 804 is a hearsay exception that applies only if the declarant of the hearsay statement is unavailable at the time of trial. Tennessee Rule of Evidence 804(a)(5) states that a declarant will be deemed unavailable if the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process." Once the declarant has been deemed unavailable under Tennessee Rule of Evidence 804(a), the next step is to determine whether the statement falls into one of the five hearsay exceptions in Tennessee Rule of Evidence 804(b). In order for the declarant's statement to be admissible, the statement must be either former testimony, a dying declaration, a declaration against interest, a declaration

of pedigree or a statement offered against a party that has wrongfully procured the unavailability of the declarant as a witness. Tenn. R. Evid. 804(b)(1), (2), (3), (4) & (6).

The Defendant sought to introduce Mr. Harbison's letter and publish it to the jury. The Defendant did not know when the letter had been written. The letter stated that Ms. West was not present at the house when the shooting occurred and also that Mr. Harbison and the Defendant did not have any problems between them. The Defendant argued that Mr. Harbison was unavailable because he believed that he would claim "privilege" if called to testify and that the letter contained a statement against interest. The trial court agreed with the State that the letter was hearsay and that it was being offered to prove the statements contained within the letter. The Defendant then argued that, despite the trial court's ruling that the letter was inadmissible hearsay, it was within the trial court's discretion to admit the letter because it was critical to the defense. The trial court responded as follows:

> I'm familiar with that [evidentiary] principle, I've seen it before. In this case, however, Ms. West the mother of [Mr.] Harbison . . . testified that she heard the phone call between the guy who said he was [the Defendant] and her son. And the gist was [the Defendant], or whoever said he was [the Defendant], asking you got beef with me? Or you got a beef? And [Mr. Harbison] saying no. No, I got no beef with you. So . . . there is evidence in the record to that effect. So this [letter] is not the only evidence that would support the theory you're pursuing. And it is certainly hearsay and it bears indicia of having been created for the purpose of . . . being made a part of this litigation.

The trial court found that Mr. Harbison's letter constituted an out-of-court statement offered to prove the truth of the matter asserted within it. The trial court found that the "introduction of the letter was not the only way to present the evidence" and that Mr. Harbison "was willing to come to court and testify. He was not unavailable." The trial court concluded that the letter did not qualify under the unavailable declarant exception to the hearsay rule.

We conclude that the trial court did not abuse its discretion when it determined that the letter was inadmissible hearsay. The declarant, Mr. Harbison, was available to testify and stated at the motion for new trial hearing that he was willing to do so. As such, his out-of-court statement was not admissible pursuant to the exception in Tennessee Rule of Evidence 804. We further conclude that this evidence was not critical to the defense. The Defendant is not entitled to relief on this issue.

## F. Sufficiency of Evidence

37

The Defendant next contends that the evidence is insufficient to sustain his convictions. He asserts that the "vast majority" of the evidence should have been suppressed and that the evidence against him was almost exclusively circumstantial. He further contends that the State presented no evidence of intent to kill. The State counters that the evidence is sufficient to support each of the Defendant's convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn. 1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge

and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee, as the prevailing party, the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## 1. Attempted Murder and Firearm Convictions

As relevant to this case, first degree premeditated murder is defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2014). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. T.C.A. § 39-13-202(d) (internal quotation marks omitted). Second-degree murder is defined as "[a] knowing killing of another[.]" T.C.A.. § 39-13-210(a)(1) (2014). A person commits criminal attempt when, "acting with the kind of culpability otherwise required for the offense," the person "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2). It is an offense to possess a firearm with the intent to go armed during the commission of a dangerous felony or employ a firearm during the commission of a dangerous felony. T.C.A. § 39-17-1324(a), (b)(1). The trial court instructed the jury that the "dangerous felony" in this case was attempted first degree murder and attempted second degree murder. *See* T.C.A. § 39-17-1324(i)(1)(A), (B).

As previously discussed, the trial court did not err when it denied the Defendant's motion to suppress the evidence found on the Defendant's cell phone. The evidence, viewed in the light most favorable to the State, showed that at least fifteen shots were fired at Ms. West's and Mr. Harbison's home on August 10, 2012. Both Ms. West and

39

Mr. Harbison were inside. Immediately prior to the shooting, someone claiming to be the Defendant called Ms. Smith and asked her to get in touch with Mr. Harbison. Ms. Smith called Ms. West and connected the Defendant to a three-way call. Ms. West then called Mr. Harbison, who was in another room of the house, and connected him to the call as well. The caller claiming to be the Defendant asked Mr. Harbison if he had any "beef" with the Defendant several times. Moments later, shots were fired at the house. Police officers recovered at least fifteen cartridge casings from the scene, and they matched the cartridge casings to weapons later found in a vehicle in which the Defendant was a passenger. Images on the Defendant's cell phone depicted him and his friends holding weapons with distinctive insignias that looked similar to the ones recovered from the vehicle and used in the shooting. This is sufficient evidence from which a rational trier of fact could infer that the Defendant was the perpetrator of the shooting. The evidence was also sufficient from which a jury could conclude that the Defendant employed a dangerous weapon, a firearm, during the commission of a dangerous felony, here, attempted first degree premeditated murder and attempted second degree murder.

As to the issue of intent, the evidence presented was that the Defendant shot directly into Ms. West's and Mr. Harbison's house multiple times while he knew that both were present in the home. From these facts, a rational jury could conclude that the Defendant intended to kill the occupants of the house. As to the Defendant's argument that the majority of the evidence was circumstantial, we note that "[c]ircumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Dorantes*, 331 S.W.3d 370 (Tenn. 2011); *see State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). Accordingly, the evidence is sufficient to support the Defendant's convictions.

## 2. Reckless Endangerment

Reckless endangerment is committed when a person "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). Reckless endangerment is a Class E felony when committed with a deadly weapon. T.C.A. § 39-13-103(b). "[F]or the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999). "Additionally, in order to convict an accused of reckless endangerment, 'the State must show that a person or class of persons were in an area in which a reasonable probability of danger existed.'" *State v. Goodwin*, 143 S.W.3d 771, 778 (Tenn. 2004) (citing *Payne*, 7 S.W.3d at 28).

The evidence in this case proved that the Defendant shot approximately fifteen bullets into Ms. West's and Mr. Harbison's house. At least one bullet hole was found in

the headboard of the bed in Ms. West's bedroom. Other bullet holes were found throughout various rooms of the house. Ms. West testified that she and Mr. Harbison were inside the house when the shooting occurred. She further testified that she was fearful and immediately got on the floor to avoid the gunfire. From these facts a rational juror could have concluded that the occupants were placed in a reasonable probability of danger. The evidence is sufficient to sustain the Defendant's conviction.

## G.   Motion for New Trial

The Defendant next contends that the trial court should have granted his motion for a new trial because Ms. West "recanted or attempted to recant her testimony" that she was inside the dwelling at the time of the shooting. The Defendant concedes that Ms. West refused to testify at the motion for new trial or sign an affidavit; however, he argues that the trial court abused its discretion when it did not grant the Defendant a new trial because the trial court "had previously ordered the apparently perjured testimony" of Ms. West and then applied an incorrect legal standard when it concluded that her alleged recantation was insufficient evidence to support the granting of a new trial. The State responds that the Defendant cannot show error in how the trial court resolved the issue because Ms. West did not testify at the motion for new trial hearing.

The test for granting a new trial in cases involving recanted testimony as newly discovered evidence is based on the following criteria:

> A new trial may be granted because of recanted testimony when (1) the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) the jury might have reached a different conclusion had the truth been told. *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn. 1999)).

*State v. Housler*, 193 S.W.3d 476, 494 (Tenn. 2006). The decision as to whether to grant a motion for new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing *Hawkins v. State*, 417 S.W.2d 774, 778 (Tenn. 1967)).

Before a trial court can grant a new trial, it must find that the testimony given by the material witness was false at trial and that the new testimony is true. *See State v. Mixon*, 983 S.W.2d 661, 673 n.17 (Tenn. 1999) (citing *Larrison v. United States,* 24 F.2d 82, 87-88 (7th Cir.1928)) (other citations omitted). Ms. West did not testify at the motion for new trial, and, thus, the Defendant has not shown what, if any, basis existed to

support a finding that her trial testimony was false. As we have previously concluded, the trial court did not err when it ordered Ms. West to testify at trial. Furthermore, the trial court did not apply an incorrect standard when it concluded that Ms. West's out-of-court unsworn statement was not sufficient to replace her sworn testimony regarding the alleged recantation. The trial court did not abuse its discretion when it stated that it would not find that Ms. West had recanted her trial testimony absent a sworn statement. Moreover, we note that Ms. West's testimony at trial was consistent with her 911 call placed the night of the shooting and her statement to an officer at the scene. Accordingly, the trial court did not abuse its discretion when it denied the Defendant's motion for new trial on this basis. The Defendant is not entitled to relief on this issue.

## H. Jury Instructions

The Defendant contends that trial court erred when it instructed the jury that all witnesses are presumed truthful and on the theory of criminal responsibility. A trial court has the duty to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the trial court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions regarding the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

"A defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superceded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). The Tennessee Supreme Court, relying on the words of the United States Supreme Court, has noted that

> jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the

deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380-81 (1990)).   A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law."   *Id.*   Even if a trial court errs when instructing the jury, such instructional error may be found harmless.   *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998).

## 1.   Truthfulness Instruction

The Defendant contends that the trial court erred when it instructed the jury that all witnesses are to be presumed truthful.   He contends that this instruction is analogous to a prosecutor's comments about his beliefs regarding a State's witness's truthfulness, which he contends this Court decreed to be prosecutorial misconduct in *State v. Ashley Wheeler*, No. W2013-02765-CCA-R3-CD, 2015 WL 1186363 (Tenn. Crim. App., at Jackson, Mar. 11, 2015), *no perm. app. filed*.   The Defendant states that it would be "logically inconsistent" to allow the trial court to make an instruction regarding its opinion about the truthfulness of witnesses.   The State responds that the Defendant's challenge to the pattern jury instruction that witnesses are presumed truthful has already been considered and rejected in *State v. Thomas Lee Hutchison*, No. E2012-02671-CCA-R3-CD, 2014 WL 1759156, at *35-36 (Tenn. Crim. App., at Knoxville, April 11, 2014), *no perm. app. filed*.

The trial court instructed the jury as follows:

You are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony.   If there are conflicting statements made by different witnesses, you must reconcile them if you can without rationally concluding that any witness has sworn falsely, for the law presumes that all witnesses are truthful.

The trial court went on to instruct the jury as to how to form their opinion about the witnesses' credibility and how witnesses are impeached.   The complained of instruction is a pattern jury instruction.   *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.04. This Court has previously held that "where a jury is charged 'fully and explicitly on the presumption of innocence and the State's duty to prove guilt beyond a reasonable doubt,' an instruction that all testifying witnesses are presumed truthful is 'constitutionally sound.'"   *State v. Joseph Todd Sweet*, No. E2010-00728-CCA-R3-CD, 2011 WL 6318506, at *36 (Tenn. Crim. App., at Knoxville, Dec. 16, 2011) (citing *Lundy v. State*,

752 S.W.2d 98, 103 (Tenn. Crim. App. 1987); *State v. Glebock*, 616 S.W.2d 897, 906 (Tenn. Crim. App. 1981); *Cupp v. Naughton*, 414 U.S. 141 (1973)), *perm. app. denied* (Tenn. April 11, 2012). The trial court further properly instructed the jury that it was within the jury's province to judge the credibility of all the witnesses. We find unpersuasive the Defendant's argument that this instruction is akin to a prosecutor's stating his or her opinion as to a witness's veracity. The Defendant is not entitled to relief on this issue.

### 2. Criminal Responsibility Instruction

The Defendant also contends that the trial court incorrectly instructed the jury on criminal responsibility. He asserts that the instruction "runs contrary to federal law, which requires personal, active employment of a firearm." He cites *Bailey v. United States*, 516 U.S. 137 (1995), in support of this contention. The State responds that the evidence presented at trial fairly raised the issue of criminal responsibility and that a jury could have concluded that the Defendant was culpable under the theory of criminal responsibility for attempted first degree murder.

The trial court instructed the jury as follows:

> The [D]efendant is criminally responsible as a party to the [charged] offense . . . if the offense was committed by the [D]efendant's own conduct, by the conduct of another for which the [D]efendant is criminally responsible or by both.

> Each party to the offense may be charged with the commission of the offense. The [D]efendant is criminally responsible for an offense committed by the conduct of another if acting with the intent to promote or assist the commission of the offense, or to benefit the proceeds or results of the offense the [D]efendant solicits, directs, aids, or attempts to aid another person to commit the offense.

We first point out that the United States Supreme Court's conclusion in *Bailey* related to the employment or active use of a firearm as referenced in a sentencing statute, and the Supreme Court held that the sentencing statute at issue required "evidence sufficient to show an active employment of the firearm by the defendant." 516 U.S. at 142. This conclusion is not applicable to the Defendant's argument that the jury instruction for criminal responsibility is contrary to federal law.

The Defendant further argues that criminal responsibility "should not apply" to the Defendant's offenses; he contends that the offenses require "personal discharge of a

firearm," contrary to the theory of criminal responsibility. As previously reviewed in the sufficiency section of this opinion, none of the offenses for which the Defendant was convicted list the "personal discharge of a firearm" as a required element to be proven beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

## I. Motion for Judgment of Acquittal

The Defendant next contends that the trial court erred when it denied his motion for judgment of acquittal after the State offered no proof that the Defendant was the shooter or a participant in the shooting of Ms. West's house and after the State offered no proof of the Defendant's intent to kill Ms. West or Mr. Harbison. The State responds that the Defendant has waived his claim because he presented his own evidence in his defense. The State further responds that the evidence presented is legally sufficient to support his convictions.

Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows:

> On [d]efendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(b). This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See, generally, Overturf v. State*, 571 S.W.2d 837 (Tenn. 1978). By presenting evidence, however, a defendant generally waives his ability to appeal a trial court's mid-trial denial of his motion for a judgment of acquittal. *Finch v. State*, 226 S.W.3d 307, 317 (Tenn. 2007).

In this case, the trial court denied the Defendant's motion for judgment of acquittal raised at the close of the State's proof, stating the following:

> The evidence before the Court now is that on . . . August 10, 2012, somebody shot up . . . Ms. West's house. And the evidence shows a complete assault on the premises, shot up the place good. Obviously no regard for any human life that might be inside. And certainly . . . the way [the shooting] was done would support a fair inference of an intent to harm anyone in the house.
>
> There's evidence that the [D]efendant and [Mr. Harbison] knew each

45

other, had some associations with each other. There's evidence that someone [identifying] himself as Mr. Lagrone called Ms. West's home shortly before the shooting trying to find out where [Mr. Harbison] was located. And shortly thereafter the shooting took place.

There's evidence that the [D]efendant was found as a passenger in a car that was involved in a car wreck and as things developed there was a search of the car, and what turned out to be the weapons that shot up the house were . . . locked in the trunk of the car that the [D]efendant was a passenger in.

There's other evidence that the [D]efendant and Mr. [Brown] were driving around in a car and were displaying weapons[.] [W]hile there is no scientific proof establishing that they are the very weapons that were used [in the shooting], nevertheless, they are virtually identical weapons. And from all these things at this point the Court would have to find that a rational trier of fact could find the [D]efendant guilty.

Following this denial, the Defendant presented evidence. The Defendant, therefore, waived his right to appeal the denial of his motion for judgment of acquittal raised at the close of the State's proof. *Id.* at 317. The Defendant renewed his motion at the close of all evidence, which the trial court denied. As we have concluded that the evidence was sufficient from which a jury could convict the Defendant of the offenses charged, we also conclude that the trial court did not err when it denied the Defendant's renewed motion. The Defendant is not entitled to relief on this issue.

## J. Sentencing

The Defendant contends that the trial court erred when it used his juvenile adjudications to enhance his sentences and when it did not require a bifurcated sentencing process for the possession of a weapon during the commission of a dangerous felony convictions. The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2012); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004). As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court

has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

"Sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, 380 S.W.3d at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708.

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. § 40-35-102, -103, -210 (2014); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*.

### 1. Juvenile Adjudications

The Defendant contends that the trial court erred when it considered his juvenile adjudications when it classified him as a Range II Offender because his juvenile adjudications "could not have been used against him at the time of adjudication," in 2007 and 2008. Thus, he contends that using those adjudications in the present case violated the ex post facto and due process clauses of the Constitution. The State responds that the Defendant is not entitled to sentencing law that predates his offenses, i.e., the sentencing law at the time of his juvenile adjudications. The State contends that the Defendant was "on notice at the time of his 2012 offenses that his two juvenile adjudications for aggravated robbery would be used to set his [sentencing] range

classification."

The trial court stated that it was using the Defendant's two prior juvenile adjudications for aggravated robbery to classify the Defendant as a Range II offender. In so doing, it addressed the Defendant's argument that a change in the law since his robbery convictions necessarily meant that the prior convictions could not be used to enhance his range:

> When [the Defendant] was a juvenile [he] was adjudicated guilty of aggravated robbery [twice]. The State's attorney filed appropriate notice of the State's intent to rely upon those convictions to seek enhanced punishment of the [D]efendant.

> Aggravated robbery is a class B felony, . . . and this Court finds that the [D]efendant is a range [II] multiple offender. This Court rejects the [D]efendant's contention that his prior [juvenile] convictions should not be used to enhance his sentences in the instant case because they could not have been so used at the time he was adjudicated guilty of those offenses, and to use them as enhancers now amounts to increasing his punishment for the prior offenses in violation of the ex post facto doctrine.

> This Court finds that only in the instant case is his punishment being increased. The punishments he received for his past crimes are not increased or otherwise effected [sic].

The record supports the trial court's application of the Defendant's two prior juvenile adjudications of aggravated robbery to enhance his range of punishment for the crimes he committed in this case. Tennessee Code Annotated section 40-35-106(a) provides that a trial court may sentence a defendant as a Range II, multiple offender by finding that the defendant has received:

> (1) A minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes . . .; or

> (2) One (1) Class A prior felony conviction if the defendant's conviction offense is a Class A or B felony.

Previously, our Code did not allow trial courts to use a defendant's prior juvenile adjudications to establish the defendant's range classification. *See* T.C.A. § 40-35-106(b)(3) (2006) (prohibiting the use of juvenile adjudications as prior convictions

for range classification purposes). However, in 2010, our Legislature amended the Code to allow for enhanced range classification upon "a finding or adjudication that a defendant committed an act as a juvenile that would constitute a Class A or Class B felony if committed by an adult." T.C.A. § 40-35-106(b)(3)(B). The change was to apply "to all defendants committing offenses on or after July 1, 2010." T.C.A. § 40-35-106 (Compiler's Notes).

The Defendant takes the position that Tennessee Code Annotated section 40-35-106(b)(3)(B) goes against long standing policy of additional safeguards to protect the constitutional interests of minors." This Court, though, has addressed the statutory change, stating as follows:

> The legislature has now seen fit to give juvenile adjudications even less protection, by allowing the sentencing judge to consider acts that would constitute a Class A or Class B felony regardless of whether the Defendant was transferred to criminal court under our transfer statute or any other. During the discussion on the Senate floor of this 2010 amendment to the statute, Senator Doug Jackson noted that juvenile adjudications do not involve the same constitutional guarantees afforded an accused in adult criminal court but commented that the amended provision permits the use of those juvenile adjudications to enhance a Defendant's range. See Tenn. Senate Session, Debate on Senate Bill 3314, April 15, 2010. The Senate was not dissuaded by Senator Jackson's comments and passed the amendment into law.

*State v. Fusco*, 404 S.W.3d 504, 544-45 (Tenn. Crim. App. 2012); *see also State v. Antoneo Williams*, No. E2014-01076-CCA-R3-CD, 2015 WL 5023136, at *11-12 (Tenn. Crim. App., at Knoxville, Aug. 25, 2015), *perm. app. denied* (Jan. 15, 2016). In accordance with this reasoning and precedent, we conclude that the trial court properly sentenced the appellant as a Range II, multiple offender based on his prior juvenile adjudications. The Defendant is not entitled to relief on this issue.

### 2. Sentence Imposed for Employing a Weapon During the Commission of a Dangerous Felony Conviction

The Defendant further contends that the trial court erred when it sentenced him to ten years for each count of employing a weapon during the commission of a dangerous felony (one felony being the attempted second degree murder of West and the other felony being attempted first degree murder of Harbison), in violation of Tennessee Code Annotated section 39-17-1324(h)(2). He asserts that this Code section requires proof that a defendant have a "prior dangerous felony" to qualify for the statutorily mandated

minimum sentence of ten years. Six years is the mandatory minimum sentence if a defendant has no prior dangerous felony. He asserts that this Code section requires that the trial court conduct a "bifurcated" sentencing process wherein the jury must be shown proof beyond a reasonable doubt that the Defendant had committed a prior dangerous felony. The State responds that, although the trial court referenced section 39-17-1324(h)(2), the State did not pursue sentencing under that statute, and therefore, the bifurcated process was not followed. The State contends, however, that regardless of the trial court's references to subsection (h)(2), the record supports the Defendant's "presumptively reasonable in-range ten-year sentences."

At the sentencing hearing, the trial court stated that it was sentencing the Defendant for his conviction of employing a weapon during the commission of a dangerous felony "as set forth in Tennessee Code Annotated section 39-17-1324 subpart (h)(2), which carries a 10 year minimum mandatory sentence." The trial court referenced subsection (h)(2) in identical fashion when it addressed the Defendant's second conviction for employing a weapon during the commission of a dangerous felony. It made no further mention of subsection (h)(2). That Code section states:

> (h)(1) A violation of subsection (b) [employing a firearm during the commission of a dangerous felony] is a Class C felony, punishable by a mandatory minimum six-year sentence to the department of correction.
>
> (2) A violation of subsection (b) [employing a firearm during the commission of a dangerous felony] is a Class C felony, punishable by a mandatory minimum ten-year sentence to the department of correction, if the defendant, at the time of the offense, had a prior felony conviction.

While these offenses list a mandatory minimum sentence, the maximum sentence within the applicable sentencing range for a Range II Offender committing a Class C offense is ten years. *See* T.C.A. § 40-35-112(b)(3).

Tennessee Code Annotated section 39-17-1324(f) provides:

> In a trial for [employment of a weapon during the commission of a dangerous felony], where the state is also seeking to have the person sentenced under subdivision (g)(2) or (h)(2), the trier of fact shall first determine whether the person possessed or employed a firearm. If the trier of fact finds in the affirmative, proof of a qualifying prior felony conviction pursuant to this section shall then be presented to the trier of fact.

In this case, the State argues that, because it was not seeking to have the Defendant sentenced pursuant to this statute, the sentencing process described in subsection (f) was not necessary.

We are concerned in this case by the trial court's statement "In count two of employing a firearm during the commission of a dangerous felony as set forth in Tennessee Code Annotated 39-17-1324 subpart (h)(2), which carries a 10 year minimum mandatory sentence." We note that the trial court went on to discuss the applicable enhancement factors it considered when sentencing the Defendant:

> In determining the [D]efendant's sentence, the Court has considered the Presentence Report, the evidence presented at trial, the [D]efendant's record of criminal conduct, his social history, and the arguments of counsel. The Court finds enhancement factor one applies. In addition to the two aggravated robberies used to enhance his range of punishment, the [D]efendant was convicted twice of assault at the age of 13, conspiracy to commit robbery at 14, a weapons offense at age 16, another felony involving a firearm at 17, and at age 18 he was convicted of assault, placed on probation and his probation was revoked.

> The assault conviction involved three shots fired at a person. In the instant offense the [D]efendant stands convicted of firing multiple rounds into a dwelling knowing that at least two people were inside the dwelling.

> The offense of reckless endangerment involved more than one victim. Because of his revoked probation, enhancement factor eight applies. Use of a firearm is not an element in counts one and three, so enhancement factor nine applies in those counts.

> Clearly, the [D]efendant had no hesitation about committing a crime when the risk to human life was high. There were 15 empty shell casings found in front of Oracle West's home.

While the trial court had adequate basis to enhance the Defendant's sentences for each of the firearms convictions to ten years, we must vacate the sentences for the firearms convictions and remand those counts to the trial court for resentencing. If the trial court based its ten-year sentence solely upon its statement that the mandatory minimum sentence is ten-years pursuant to Tennessee Code Annotated section 39-17-1324(h)(2), then it did not follow the sentencing procedures articulated in Tennessee Code Annotated section 39-17-1324(f). The trial court's sentencing determinations are affirmed in all other regards. Accordingly, we vacate the sentences

for the two counts of employing a firearm during the commission of a felony and remand the case for the trial court to resentence the Defendant on those counts.

## K. Cumulative Error

The Defendant lastly contends that the cumulative effect of the constitutional and non-constitutional errors in this case requires a reversal of his convictions. The State responds that because the Defendant has failed to prove a single basis for error, it follows that he is not entitled to a new trial based on cumulative error.

"We recognize that while individual errors may not necessitate [relief], the combination of multiple errors may necessitate reversal of a conviction in order to ensure a [defendant] receives a fair trial." *Chad Hughes v. State*, No. M2008-01531-CCA-R3-PC, 2009 WL 1409776, at *7 (Tenn. Crim. App., at Nashville, May 19, 2009) (citing *State v. Zimmerman*, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1999)), *no perm. app. filed*. We have determined that the potential error in the sentencing proceedings does not require any further relief.

## III. Conclusion

After a thorough review of the record and the applicable law, we affirm the trial court's judgments. We vacate the sentences for the two counts of employing a firearm during the commission of a felony remand the case for the trial court to resentence the Defendant on those counts.

_____
ROBERT W. WEDEMEYER, JUDGE